IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| JIM S. ADLER, P.C. and JIM ADLER, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO.4:20-cv-3667_____ |
| | § | |
| MICHAEL W. SLOCUMB and SLOCUMB | § | |
| LAW FIRM, LLC, | § | **JURY DEMANDED** |
| | § | |
| Defendants. | § | |
| | § | |

**COMPLAINT**

Plaintiffs Jim S. Adler, P.C. and Jim Adler, appearing through their undersigned counsel, allege as follows:

**NATURE OF ACTION AND JURISDICTION**

1.     This is an action for copyright infringement under the Copyright Act, as amended, 17 U.S.C. §101 *et seq.*; for trademark infringement and unfair competition under the Trademark Act of 1946, as amended, 15 U.S.C. §1051 *et seq.* ("Lanham Act"); for trademark dilution under the Texas Business and Commerce Code; and for trademark infringement, unfair competition, unjust enrichment, misappropriation of name or likeness, and tortious interference under Texas common law.

2.     This Court has jurisdiction over the subject matter of this action pursuant to the Copyright Act, 17 U.S.C. §502, the Lanham Act, 15 U.S.C. §1121, as well as 28 U.S.C. §§1331 and 1338, and has supplemental jurisdiction over the state law claims under 28 U.S.C. §1367(a).

3.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §§1391(b) and (c) because a substantial part of the events giving rise to the claim occurred in the district and Defendants have conducted business in the Southern District of Texas and are subject to the Court's personal jurisdiction with respect to this action.

## PARTIES

4.      Plaintiff Jim S. Adler, P.C. (the "Adler Firm") is a Texas corporation with a principal place of business at 3D/International Tower, 1900 West Loop South, 20th Floor, Houston, Texas 77027.

5.      Plaintiff Jim Adler is a Texas resident domiciled in Houston, Texas.

6.      Upon information and belief, Defendant Michael Slocumb is an Alabama resident domiciled in Auburn, Alabama.

7.      Upon information and belief, Defendant Slocumb Law Firm, LLC (the "Slocumb Firm") is an Alabama limited liability company with a principal place of business at 145 East Magnolia Avenue, Suite 201, Auburn, Alabama 36830.  The Slocumb Firm is operating in Houston from its office at 550 Post Oak Boulevard, Suite 370, Houston, Texas 77027.

## OVERVIEW OF THE CASE

8.      Personal injury attorney Michael Slocumb is not Jim Adler, "The Texas Hammer," but he wants the public to believe he is.  To carry out the ruse, Defendants have adopted Adler's famous persona and Plaintiffs' intellectual property in a brazen bid to confuse and deceive consumers. Slocumb's unlawful course of conduct includes co-opting Adler's "Hammer" moniker and creating a television commercial that mimics—virtually shot-by-shot and line-by-line—one of Adler's most well-known commercials; misappropriating Adler's likeness to illicitly benefit from Adler's public reputation; and exploiting Adler's famous trademarks.  Though some of Defendants' activities use new technology, the foundation of Adler's suit is not complicated—Defendants are illegally exploiting Adler's persona and intellectual property to confuse consumers for commercial gain.

## FACTS

### A.      Jim Adler, The Texas Hammer

9.      The Adler Firm is a preeminent Texas personal injury law firm, representing injured parties in all types of personal injury cases, with a particular focus on auto accidents and commercial vehicle / eighteen-wheeler accidents.  Plaintiffs view their practice as "safety law," and focus on trying to help Texas injury victims and their families recover to the greatest extent possible, while at the same time using the legal system to make society a safer place to live.

10.      The Adler Firm was formed and is led by Jim Adler, who has become widely known in Texas over the course of his fifty-three year (and counting) legal career.  Adler graduated from the University of Texas School of Law and was admitted to practice law by the State Bar of Texas in 1967. After brief stints serving in a legal capacity in both the military and law enforcement, Adler went into private practice in 1973, hanging his own shingle and starting the Adler Firm.

11.      Since beginning as a solo practitioner, Adler has grown the Adler Firm into one of the largest, most widely recognized, and most successful personal injury law firms in Texas.  The Adler Firm currently has four offices in Houston, Dallas, San Antonio, and Channelview.  The firm employs approximately 300 people, including 27 lawyers.

12.      Plaintiffs' success is the result of decades of hard work, building a strong reputation for aggressively representing Texas injury victims and their families, as embodied in his persona as The Texas Hammer.  Over the years, Plaintiffs have built a strong referral base comprised of several generations of satisfied clients.

13.      This reputation is the result not only of the hard work of Plaintiffs but also of the significant effort and expense that Plaintiffs have incurred in promoting themselves throughout Texas.

14.      In 1977, the United States Supreme Court upheld the right of lawyers to advertise their legal services, holding it was commercial free speech protected under the First Amendment.  Shortly

after that decision, Adler became one of the first lawyers in Texas to advertise on television. Plaintiffs' advertising efforts stem from a desire to provide knowledge to and serve members of the community that are unfamiliar with the legal system or otherwise unaware of their legal rights. That commitment remains one of the driving forces behind Plaintiffs' practice.

15.     Plaintiffs' advertisements have enabled Adler to develop very strong recognition of his brand and persona as The Texas Hammer among the public. As the Dallas Business Journal wrote in 2015, for decades "Jim Adler, 'The Texas Hammer,' has used an aggressive, memorable advertising campaign to make his law firm a household name in several areas of the state." The Dallas Business Journal also noted that, "[a]s far as personal injury lawyers go, Jim Adler might be the most well known in Texas."

**B.     Plaintiffs' Well-Known Brand and Persona**

16.     Since at least the 1990s, Plaintiffs have consistently and continuously used several trademarks, including JIM ADLER, THE HAMMER, and THE TEXAS HAMMER (collectively, the "Adler Marks") to identify and promote Plaintiffs and the legal services they provide.

17.     The Adler Marks are inherently distinctive and serve to identify and indicate the source of Plaintiffs' services to the consuming public.

18.     The Adler Marks are famous in the State of Texas under TEX. BUS. & COM. CODE §16.103. The Adler Marks became famous in Texas before Defendants' use described herein.

19.     Adler owns several federal trademark registrations for the Adler Marks. *See* U.S. Reg. Nos. 3507257, 3503851, and 3730395. These registrations are valid and subsisting, and each is incontestable under 15 U.S.C. §1065. True and correct copies of these registrations are attached as **Exhibit A**.

20.     In order to build a strong brand and persona for aggressively representing Texas injury victims and their families as The Texas Hammer, Plaintiffs advertise on television, radio, billboards,

-4-

and on the internet.  The Adler Marks are consistently used in Plaintiffs' advertisements across all media formats.  The ads themselves are strategically designed to position Adler and his firm's lawyers as leading attorneys capable of handling all types of personal injury claims, with an emphasis on auto and truck accidents.  The ads often center on Adler's persona as The Texas Hammer, regularly referencing his nickname and including other hammer-related indicia, such as Adler wielding a sledgehammer and using phrases like "It's hammer time!"  The bulk of Plaintiffs' advertising is in Texas's three largest markets—Houston, San Antonio, and Dallas-Fort Worth.

21.     Since 2000, Adler has spent over $100 million on television, internet, radio, and billboard advertisements targeting the Houston, San Antonio, and Dallas-Fort Worth markets.

22.     For each of these three major Texas markets, Plaintiffs run numerous television advertisements in both English and Spanish on multiple television stations throughout the year.  In Houston, Plaintiffs run approximately 45,000 television commercials per year.  In San Antonio, they run about 87,000 television commercials per year.   And in Dallas-Fort Worth, Plaintiffs run approximately 85,000 television commercials per year.

23.     The use of television advertisements in these major Texas markets has allowed Plaintiffs to reach millions of Texans and build an incredibly strong brand and reputation among the public.  The Houston market is the eighth largest television market in the nation, reaching more than 6 million viewers.  The San Antonio market is the thirty-first largest television market in the nation, reaching more than 2.3 million viewers.  The Dallas-Fort Worth market is the fifth largest television market in the nation, reaching more than 6.8 million viewers.  Combined, Plaintiffs' television advertising allows them to reach over 15 million people—more than half of all Texans.

24.     A review of the television advertisements Plaintiffs ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm.  In 2019, over a four-week period and not including commercials run on cable, television advertisements for Plaintiffs

repeatedly reached a large portion of the 25-to-54-year-old demographic in each of these major markets. In the Houston market, Plaintiffs' advertisements reached 70.4% of the demographic, with the average viewer seeing each ad 15.2 times, for 29,563,125 total impressions. In the San Antonio market, their advertisements reached 47.5% of the demographic, with the average viewer seeing each ad 14.0 times, for 6,420,146 total impressions. And in the Dallas-Fort Worth market, Plaintiffs' advertisements reached 58.7% of the demographic, with the average viewer seeing each ad 13.9 times, for 23,406,564 total impressions.

25.     For each of these major Texas markets, Plaintiffs run numerous radio advertisements in both English and Spanish on multiple radio stations throughout the year. For Houston, San Antonio, and Dallas-Fort Worth, Plaintiffs run approximately 23,000 radio commercials per year in each market.

26.     The use of radio advertisements in these major markets has allowed Plaintiffs to reach millions of Texans and enhance their brand recognition. The Houston market is the sixth-largest radio market in the nation, reaching more than 5 million listeners. The San Antonio market is the twenty-sixth largest radio market in the nation, reaching more than 1.8 million listeners. And the Dallas-Fort Worth market is the fifth-largest radio market in the nation, reaching more than 5.3 million listeners. Combined, Plaintiffs' radio advertising allows them to reach over 12 million Texans.

27.     A review of the radio advertisements Plaintiffs ran in these major Texas markets showed that the commercials obtained significant exposure for the Adler Firm. In 2019, over a four-week period, radio advertisements for Plaintiffs repeatedly reached a majority of the 25-to-54-year-old demographic in each of these major markets. In the Houston market, Plaintiffs' radio advertisements reached 87% of the demographic, with the average listener hearing each ad 8.9 times, for 23,519,600 total impressions. In the San Antonio market, their advertisements reached 67% of the demographic, with the average listener hearing each ad 9.2 times, for 6,258,000 total impressions. And in the Dallas-

Fort Worth market, Plaintiffs' advertisements reached 56.1% of the demographic, with the average listener hearing each ad 7.1 times, for 13,133,600 total impressions.

28.     For each of these major Texas markets, Plaintiffs run numerous billboard advertisements in both English and Spanish.  At any given time, Plaintiffs have approximately 40 billboard advertisements in the Houston market, 20 in the San Antonio market, and 40 in the Dallas-Fort Worth market.  On average, the billboard advertisements purchased by Plaintiffs generate 25 to 30 million impressions per week.

29.     Plaintiffs' advertisements, all of which prominently incorporate the Adler Marks, have enabled Plaintiffs to develop very strong brand recognition in Texas.  The Houston Chronicle wrote in 2007 that "[e]verybody knows what Adler sounds like from his ceaseless TV commercials."  In 2015, the Dallas Morning News named one of Plaintiffs' television commercials to a list of five of the most memorable attorney ads in Dallas-Fort Worth.

30.     More recently, a montage comprised of Plaintiffs' English- and Spanish-language television advertisements was featured on a 2019 episode of *Last Week Tonight*, an Emmy-award winning HBO news satire program broadcast around the globe.

31.     As a result of these efforts by Plaintiffs, the consuming public throughout the United States, including in Texas, widely recognizes and associates the Adler Marks with Plaintiffs.  Through Plaintiffs' long use and promotion of the Adler Marks, the marks have become distinctive to designate Plaintiffs, to distinguish Plaintiffs and their services from those of others, and to distinguish the source or origin of Plaintiffs' services.  As a result, Plaintiffs have acquired strong and enforceable common law rights in the Adler Marks.

32.     Plaintiffs' advertisements have further enabled Adler to develop strong recognition of his persona as The Texas Hammer among the consuming public, including in Texas.  As a result, Adler owns strong and enforceable common law publicity rights in his persona as The Texas Hammer.

C.       **Plaintiffs' *We Stand Tough* Commercials**

33.     One of Plaintiffs' most popular television commercials is *We Stand Tough*, created in 2018 and run in fifteen- and thirty-second spots. *We Stand Tough* employs pugnacious dialogue spoken in a defiant tone and with hammer-related imagery to showcase Adler's reputation for aggressively representing personal injury victims as The Texas Hammer. Scenes from *We Stand Tough* were prominently featured in the montage from the HBO episode of *Last Week Tonight* mentioned above.

34.     The fifteen-second version of *We Stand Tough* begins with Adler facing off against an eighteen-wheeler. The initial shot shows a menacing truck and a close-up of Adler holding a sledgehammer, during which he warns that "greedy insurance companies play rough" and asks if the audience wants to "beat them at their own game." Next, Adler is shown center frame from the waist up wielding his sledgehammer in both hands and speaking directly into the camera with an otherwise deserted road behind him lined by trees on both sides. He exclaims, "I'm Jim Adler, The Texas Hammer— Bring it on!" as the scene turns to him and the truck beginning to approach each other.

35.     Adler and the eighteen-wheeler are then shown at a great distance, dramatically highlighting Adler's size with the menacing truck charging his way. They continue to approach one another as Adler growls "I stand tough and carry a big hammer!" before his logo and contact information appear.

36.     The thirty-second version is similar. Facing off against a menacing eighteen-wheeler, the commercial begins with the same close-up shots of Adler and the truck. Adler warns, "it ain't pretty when you face a bad truck wreck." The scene then cuts to the center-frame shot of Adler wielding his sledgehammer as he speaks directly into the camera with the deserted road lined by trees behind him. "Greedy insurance companies play dirty. Bring it on!"

37.     Next, a series of shots shows Adler and the truck approaching each other, including the distanced shot dramatically highlighting their comparative size. Another shot shows Adler looking

into the camera again as he walks toward the truck, growling "I'm Jim Adler, the Texas Hammer!" Shots of Adler and the truck continue to alternate as a narrator's voice says: "Go at them with Jim Adler, the tough, smart lawyer who knows how to beat them at their own game."

38.     The shot then turns back to Adler from the waist up walking with the deserted road behind him and holding his sledgehammer in both hands.  Adler stops in the road, exclaiming "I stand tough and carry a big, big hammer!"  Each time he says "big," Adler shakes the sledgehammer for emphasis.

39.     A series of shots finally shows the truck screeching to a halt to avoid colliding with Adler.  Adler stands firm without flinching as the truck continues skidding and comes to a rest.  "I thought so," Adler laughs.  The last shot before Adler's logo and contact information shows Adler and the truck from one side facing each other, again highlighting their comparative size.

40.     *We Stand Tough* is subject to copyright protection under 17 U.S.C. §102.  The work contains material wholly original to Adler, including the selection and arrangement of the constituent parts of the work, as well as the overall look and feel.  Adler owns a registration for *We Stand Tough* issued by the United States Copyright Office.  *See* Reg. No. PA 2-230-630, attached as **Exhibit B**.

**D.     Plaintiffs' Online Advertising**

41.     As with their television advertising, Plaintiffs were also early leaders among lawyers in using the internet to advertise their legal services.  Since 1997, Plaintiffs have marketed their legal services through jimadler.com.  In 2018, jimadler.com averaged more than 52,000 visitors to the site per month.

42.     Plaintiffs also engage in a substantial amount of online advertising, including keyword advertising through search engines to drive internet traffic to the Adler Firm.  Plaintiffs spend a considerable sum of money each month to advertise online, including on keyword advertisements

placed through Google's search engine.  Plaintiffs spend hundreds-of-thousands of dollars every year purchasing the Adler Marks as keywords.

43.     Plaintiffs only purchase keywords that are their own marks or terms related to the type of cases they handle.  For example, Plaintiffs purchase keyword ads for "Jim Adler" and "Texas Hammer," as well as terms like "car accident lawyer."  The vast majority of the keyword ads that Plaintiffs purchase is for consumers specifically entering the Adler Marks as search terms.  Plaintiffs do not purchase keywords related to any other lawyer's name, firm, or mark.

44.     All the search engine advertisements purchased by Plaintiffs prominently include the Adler Marks and clearly identify the Adler Firm as the source of the advertisement.  Here is an example of one such advertisement, as it appeared from a Google search:



### E.     Michael Slocumb and the Slocumb Firm

45.     Upon information and belief, Defendant Michael Slocumb is a personal injury attorney who offers legal services through Defendant Slocumb Law Firm, LLC.  Slocumb is the sole owner of the Slocumb Firm and directs and controls the Slocumb Firm's advertising strategy, including the creation of the television commercial *Tough* and the purchase of the Adler Marks as keywords.  As the Slocumb Firm's sole owner, Slocumb has the authority to bind the firm in transactions.

46.     Defendants have law offices in six states (Alabama, Colorado, Maryland, Mississippi, Texas, and West Virginia), as well as in the District of Columbia.  To promote their legal services, Defendants create and run television commercials and online advertisements.  Defendants also own a website at slocumblaw.com and use Facebook, Twitter, and YouTube to promote their legal services.

47.     Upon information and belief, Defendants' website and social media pages are publicly accessible from anywhere in the United States, including Texas.  In association with or as part of the Slocumb Firm, Defendants operate a call center connected with slocumblaw.com, through which they solicit personal injury cases, including from calls they receive from keyword advertisements.

48.     Upon information and belief, beginning well after Plaintiffs adopted the Adler Marks, Slocumb began referring to himself as the "Hammer."  Defendants' website contains multiple references to Slocumb as the "Alabama Hammer."  In particular, the homepage features a commercial titled "Alabama Hammer" in the video gallery and a link to a specific page at the bottom titled "Alabama Hammer."  Clicking on the "Alabama Hammer" link leads the viewer to a page on Defendants' website that prominently states "FIND OUT HOW THE ALABAMA HAMMER CAN HELP!" and uses a URL containing "Alabama Hammer" (e.g. slocumblaw.com/alabama-hammer-741).  The "About Our Firm" page at slocumblaw.com further states that Slocumb is "[k]nown as the Alabama Hammer."

49.     Upon information and belief, Slocumb also refers to himself as the "DC Hammer." A YouTube account with the name "Mike Slocumb Law Firm" has posted numerous television commercials that refer to Slocumb as the "DC Hammer."  The description of one such video posted on YouTube on May 28, 2019 begins: "The DC Hammer can be seen everywhere – even a busy city street with traffic. If you've been hurt in a car wreck, get a car accident lawyer from www.slocumblaw.com."

50.     Upon information and belief, Slocumb also refers to himself simply as the "Hammer" in advertising and marketing.  For instance, two television commercials created by Defendants feature Slocumb driving in a car with a license plate that reads "HAMMER."  In both commercials, the camera zooms in momentarily to accentuate the license plate.

**F.     Defendants' *Tough* Commercial**

51.     Upon information and belief, Slocumb contracted with a production company in 2019 to create the *Tough* commercial.  *Tough* is a fifteen-second television commercial that copies both the fifteen- and thirty-second versions of Plaintiffs' *We Stand Tough* commercial.

52.     Like *We Stand Tough*, the *Tough* commercial centers on Slocumb facing off against an eighteen-wheeler.  The commercial begins with a shot of Slocumb center frame from the waist up, holding a sledgehammer with a deserted road behind him lined by trees on either side.  "Cheap insurance companies play rough," he growls, speaking directly into the camera.  The shot cuts to a scene of the truck racing along the road as Slocumb continues, "I beat em' at their own game!"

53.     The scene then turns back to Slocumb center frame from the waist up, speaking into the camera as he walks along the deserted road.  "I'm Mike Slocumb, the Alabama Hammer," he yells, holding his sledgehammer with both hands.  "I stand tough and carry a big hammer!"  Mirroring Adler, Slocumb shakes his sledgehammer for emphasis when he says "big."

54.     Next, the scene changes to a shot from one side of the road at a distance as Slocumb and the truck move closer, highlighting their comparative size.  Slocumb stops in the road, staring down the truck without flinching as it screeches to a halt.  When it finally stops, Slocumb looks towards the camera and says, "that's what I thought!"

55.     As further illustrated below, the language and sequence in Defendants' *Tough* commercial mimics the language and sequence in Plaintiffs' *We Stand Tough* commercials.

-12-

| *We Stand Tough* (15 seconds) | *We Stand Tough* (30 seconds) | *Tough* (15 seconds) |
|---|---|---|
| "Greedy insurance companies play rough." | "Greedy insurance companies play dirty. Bring it on!" | "Cheap insurance companies play rough." |
| "Wanna beat them at their own game?" | "I'm Jim Adler, the Texas Hammer!" | "I beat them at their own game!" |
| "I'm Jim Adler, the Texas Hammer!" | Narrator: "Go at them with Jim Adler—the tough, smart lawyer that knows how to beat them at their own game." | "I'm Mike Slocumb, the Alabama Hammer!" |
| "Bring it on!" | "I stand tough and carry a big, big hammer!" | "I stand tough and carry a big hammer!" |
| "I stand tough and carry a big hammer!" | As the truck stops: "I thought so! | As the truck stops: "That's what I thought." |

56.    As further illustrated below, the setting, camera shots, and sequence of scenes in *Tough* also closely resemble the setting, camera shots, and sequence of scenes in *We Stand Tough*.





57.     Throughout *Tough*, Slocumb speaks in a tone that mirrors Adler's voice as The Texas Hammer, and that sounds markedly different from Slocumb's voice in his other commercials.

58.     *Tough* is substantially similar to *We Stand Tough* such that it constitutes a copy of *We Stand Tough* and/or a derivative work based on *We Stand Tough*. Defendants had access to *We Stand Tough*, which was widely run on television, showcased in the montage on HBO, and publicly available on YouTube.

59.     Upon information and belief, Defendants created and distributed copies of *Tough*, including to third parties who coordinated the placement of the commercial in various advertising outlets, such as on television and internet platforms. Defendants have further displayed *Tough* publicly, including by running the commercial on television and by making it viewable through internet platforms accessible to the public.

60.     Plaintiffs sent Defendants a demand letter in March 2020 advising them of Plaintiffs' intellectual property rights, including their copyrights in *We Stand Tough* and trademarks rights in the Adler Marks. Defendants never responded, despite Adler's repeated attempts to make contact.

-14-

**G.**     **Defendants' Expansion into Texas**

61.     Ignoring Plaintiffs' March 2020 letter—which expressly raised concerns regarding Defendants' *Tough* commercial and use of "Hammer"—Defendants expanded their business into Texas in June 2020 by opening offices in Houston and Dallas.

62.     Upon information and belief, Defendants are advertising and promoting Slocumb as the "Alabama Hammer," the "DC Hammer," and/or the "Hammer" to consumers in Texas. Defendants promote their services online at slocumblaw.com, which is visible to Texas consumers and includes links to Defendants' Texas offices.  The website at slocumblaw.com makes numerous references to Slocumb as the "Alabama Hammer."  In addition, Defendants promote their services through social media platforms such as YouTube.  Defendants' videos on YouTube are visible to Texas consumers and make numerous references to Slocumb as the "Alabama Hammer," the "DC Hammer," and/or the "Hammer."

63.     Upon information and belief, Defendants opened offices in Dallas and Texas in an effort to divert prospective clients away from Plaintiffs by associating Slocumb and the Slocumb Firm with Adler's reputation as The Texas Hammer and usurping the goodwill associated with the Adler Marks.  Defendants' offices are located in Plaintiffs' most longstanding markets, and Defendants regularly run advertisements in both markets promoting their competing legal services.

64.     Upon information and belief, Defendants' decision to enter Texas and use "hammer" and other hammer-related indicia was done willfully with full knowledge that these activities infringe Plaintiffs' intellectual property rights.

**H.**     **Defendants' Infringing Click-to-Call Scheme**

65.     After receiving Plaintiffs' letter, and around the time Defendants expanded into Texas, Defendants began engaging in yet another fraudulent scheme to trade on the goodwill and reputation of Plaintiffs and the Adler Marks in Texas, and to deceptively induce prospective clients who are using

mobile devices to specifically seek out Plaintiffs into mistakenly contacting Defendants and engaging the Slocumb Firm instead.

66.     Upon information and belief, the Slocumb Firm serves the Texas legal market through its offices in Dallas and Houston, as well as online at slocumblaw.com, which advertises Slocumb's personal injury services under his "Hammer" monikers.  In association with or as part of the Slocumb Firm, Defendants operate a call center associated with slocumblaw.com, through which they solicit personal injury cases from Texas consumers.

67.     To further their scheme to impersonate Adler in Texas, Defendants purchase the Adler Marks as keywords on mobile devices, which triggers advertisements for Defendants' services when consumers enter the Adler Marks as search terms in Google's search engine.  Upon information and belief, Defendants purchase the Adler Marks as keywords on mobile devices and use the click-to-call tool because of the likelihood that consumers will be confused and quickly click on Defendants' ad not realizing that the link is unaffiliated with Plaintiffs.

68.     As a result, Google searches for "Jim Adler" and "Texas Hammer" on mobile devices result in search pages that display Defendants' advertisements, often surrounding one or more of the Adler Marks, as shown in the two examples directly below:

Example #1                         Example #2



69.     As shown above, consumers specifically searching for Plaintiffs are likely to believe that Defendants' advertisements are placed by Plaintiffs or that Defendants are affiliated with Plaintiffs or Adler's persona as The Texas Hammer.  This is particularly true on mobile devices, where consumers are quickly searching, often when dealing with the stressful aftermath of an accident, the typeface of the ads is much smaller, and the only content displayed on the screen is an advertisement directly below one or more of the Adler Marks, which consumers have entered as a search term.

70.     Also as part of their scheme to impersonate Adler, Defendants are bidding increasingly higher amounts to purchase the Adler Marks as keywords.  The effect of Defendants' increasingly higher bids is not only to drive up the cost for Plaintiffs to purchase their own marks for keyword searches, but also to allow Defendants' advertisements to appear next to or before Plaintiffs' own ads. By having their confusing ads appear next to or before Plaintiffs' ads, Defendants are able to confuse

consumers and cause a higher number of consumers searching specifically for Adler or to instead mistakenly call Defendants.

71.     As also shown above, Defendants' online advertisements on mobile devices use Google's click-to-call tool.  Consumers who tap on the click-to-call link (intentionally or not) are connected to a call center operated by Defendants.  Defendants' ads often do not give the consumer the ability to click through to a separate website or garner any further information before the call is made.

72.     Upon information and belief, Defendants' employees who answer such calls are instructed to answer the call with a greeting such as "did you have an accident" or "tell me about your accident."  This continues Defendants' scheme of deceiving consumers into believing that they have contacted Plaintiffs and are speaking with the Adler Firm or someone affiliated with the firm. Defendants' scheme is to keep confused consumers—who were specifically searching for Adler—on the phone and talking to his employees as long as possible in a bait-and-switch effort to build rapport with the consumer and ultimately convince them to engage Defendants instead.

73.     Upon information and belief, when prospective clients who have contacted Defendants by phone through their keyword advertisements ask whether they have reached the "Hammer," Defendants employees mislead consumers by holding the Slocumb Firm out as the "Hammer" firm without clarifying that Defendants are unaffiliated with Adler.

74.     In this manner, Defendants wrongfully induce prospective clients trying to reach Plaintiffs into engaging his competing services.  The nature of his scheme leaves little doubt as to Defendants' bad-faith intent to trade on Adler's persona as The Texas Hammer and the goodwill associated with the Adler Marks.

75.     Defendants have used and are using the Adler Marks in commerce, including in Texas. Defendants' use of these marks began long after Adler developed rights in the Adler Marks and after

the Adler Marks became famous in Texas.  Defendants are not affiliated with or sponsored by Plaintiffs and have not been authorized by Plaintiffs to use the Adler Marks.

**I.     Effect of Defendants' Scheme**

76.     Defendants' unauthorized creation of *Tough* violates Plaintiffs' exclusive right to reproduce his copyrighted work *We Stand Tough* and Plaintiffs' exclusive right to prepare derivative works based on *We Stand Tough*.

77.     Defendants' unauthorized reproduction of *Tough*, including the making of any copies, violates Plaintiffs' exclusive right to reproduce his copyrighted work *We Stand Tough* and Plaintiffs' exclusive right to prepare derivative works based on *We Stand Tough*.

78.     Defendants' unauthorized distribution of *Tough*, including their distribution of any copies, violates Plaintiffs' exclusive right to distribute their copyrighted work *We Stand Tough*.

79.     Defendants' unauthorized display of *Tough*, including on television and through outlets accessible on the internet, violates Plaintiffs' exclusive right to publicly display their copyrighted work *We Stand Tough*.

80.     Defendants' unauthorized use of "Hammer" in connection with *Tough*, along with Defendants' mimicry of Adler's voice and other elements from *We Stand Tough*, misappropriates Adler's name or likeness.

81.     Defendants' unauthorized use of the moniker the "Alabama Hammer," the "DC Hammer," and/or the "Hammer" in offering legal services in Texas, including on their website at slocumblaw.com and in connection with their commercials on YouTube, misappropriates Adler's name or likeness.

-19-

82.     Defendants' unauthorized use of various hammer-related indicia, including in connection with their various monikers and in the content of their advertisements (e.g., as shown below), misappropriates Adler's name or likeness.

 

83.     Defendants' misappropriation of Adler's name or likeness as detailed above allows Defendants to commercially benefit from the value of Adler's extensive efforts in developing his persona as The Texas Hammer and to avoid the costs incurred by Adler in cultivating his strong reputation among the public.

84.     Defendants' unauthorized use of the Adler Marks is likely to cause confusion, to cause mistake, and/or to deceive customers and potential customers of the parties, at least as to some affiliation, connection, or association of Defendants with Plaintiffs, or as to the origin, sponsorship, or approval of Defendants' services by Plaintiffs.

85.     Defendants' unauthorized use of the Adler Marks falsely designates the origin of his services and falsely and misleadingly describes and represents facts with respect to Defendants and their services.

86.     Defendants' unauthorized use of the Adler Marks enables Defendants to trade on and receive the benefit of goodwill built up at great labor and expense by Plaintiffs over the years, and to gain acceptance for their services not solely on their own merits, but on the reputation and goodwill of Plaintiffs, the Adler Marks, and Plaintiffs' services.

87.     Defendants' unauthorized use of the Adler Marks is likely to dilute the famous Adler Marks in Texas as their use weakens the ability of the marks to distinguish the source of Plaintiffs' services.

88.     Defendants' unauthorized creation of *Tough*, misappropriation of Adler's name or likeness, and use of the Adler Marks unjustly enriches Defendants at Plaintiffs' expense.  Defendants have been and continues to be unjustly enriched by obtaining a benefit from Plaintiffs by taking undue advantage of Plaintiffs and their goodwill.  Specifically, Defendants unlawful course of conduct allows them to trade on and profit from Adler's persona as The Texas Hammer and the goodwill developed by Plaintiffs in the Adler Marks, resulting in Defendants wrongfully obtaining a monetary and reputational benefits for their own business and services.

89.     Defendants' unauthorized use of the Adler Marks removes from Plaintiffs the ability to control the nature and quality of the services provided under the Adler Marks and places the valuable reputation and goodwill of Adler in the hands of Defendants, over whom Plaintiffs lack control.

90.     Defendants' unauthorized copying of *We Stand Tough*, appropriation of Adler's name or likeness, and use of the Adler Marks has prevented an otherwise-likely business relationship from forming between Plaintiffs and their prospective consumers.  Since Defendants began operating in Texas, the rate at which Plaintiffs convert prospective consumers into clients through keyword advertising is measurably lower.  The nature of Defendants' actions demonstrates that they intended to interfere with Plaintiffs' prospective relationships, and that they knew their use of Plaintiffs' intellectual property was certain or substantially certain to prevent Plaintiffs from forming business relationships with prospective customers.

91.     Defendants' unlawful course of conduct described herein has harmed Plaintiffs, including by diverting prospective clients away from Plaintiffs and by significantly increasing the costs for Adler to use keyword advertisements triggered by his own registered trademarks.

92.     Unless these acts of Defendants are restrained by this Court, they will continue, and they will continue to cause irreparable injury to Plaintiffs and to the public for which there is no adequate remedy at law.

## COUNT I: FEDERAL COPYRIGHT INFRINGEMENT

93.     Plaintiffs repeats the allegations above as if fully set forth herein.

94.     The acts of Defendants complained of herein constitute infringement of Plaintiffs' copyrighted work *We Stand Tough* in violation of 17 U.S.C. §106.

95.     Defendants' acts complained of herein have been deliberate, willful, intentional, or in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights in *We Stand Tough*.

## COUNT II: FEDERAL TRADEMARK INFRINGEMENT

96.     Plaintiffs repeats the allegations above as if fully set forth herein.

97.     The acts of Defendants complained of herein constitute infringement of the federally registered Adler Marks in violation of 15 U.S.C. §1114(1).

98.     Defendants' acts complained of herein have been deliberate, willful, intentional, or in bad faith, with full knowledge and conscious disregard of Plaintiffs' rights in the Adler Marks, and with intent to cause confusion and to trade on Plaintiffs' vast goodwill in the Adler Marks.  In view of the egregious nature of Defendants' infringement, this is an exceptional case within the meaning of 15 U.S.C. §1117(a).

## COUNT III: VIOLATION OF LANHAM ACT SECTION 43(a)

99.     Plaintiffs repeat the allegations above as if fully set forth herein.

100.     The acts of Defendants complained of herein constitute trademark infringement, false designation of origin, false or misleading descriptions or representations of fact and unfair competition in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a).

101.     Plaintiffs have been damaged by Defendants' acts of trademark infringement, false designation or origin, false or misleading descriptions or representations of fact and unfair competition.

## COUNT IV: COMMON LAW MISAPPROPRIATION OF NAME OR LIKENESS

102.     Plaintiffs repeat the allegations above as if fully set forth herein.

103.     The acts of Defendants complained of herein constitute misappropriation of name or likeness (infringement of publicity rights) in violation of the common law of the State of Texas.

## COUNT V: COMMON LAW TRADEMARK INFRINGEMENT

104.     Plaintiffs repeat the allegations above as if fully set forth herein.

105.     The acts of Defendants complained of herein constitute trademark infringement in violation of the common law of the State of Texas.

## COUNT VI: COMMON LAW UNFAIR COMPETITION

106.     Plaintiffs repeats the allegations above as if fully set forth herein.

107.     The acts of Defendants complained of herein constitute unfair competition in violation of the common law of the State of Texas.

## COUNT VII: TRADEMARK DILUTION UNDER TEXAS LAW

108.     Plaintiffs repeat the allegations above as if fully set forth herein.

109.     The acts of Defendants complained of herein constitute dilution by blurring of Plaintiffs' famous Adler Marks in violation of Texas Business and Commerce Code §16.103.

110.     Defendants willfully intended to trade on the recognition of the famous Adler Marks.

## COUNT VIII: UNJUST ENRICHMENT

111.    Plaintiffs repeat the allegations above as if fully set forth herein.

112.    The acts of Defendants complained of herein constitute unjust enrichment of Defendants at the expense of Plaintiffs.

## COUNT IX: TORTIOUS INTERFERENCE

113.    Plaintiffs repeats the allegations above as if fully set forth herein.

114.    The acts of Defendants complained of herein constitute tortious interference with a prospective business opportunity.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray that:

(a)    Defendants, as well as their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be permanently enjoined and restrained from reproducing, distributing, or publicly displaying *Tough* and from otherwise violating Plaintiffs' rights in *We Stand Tough*; using the Adler Marks and any other mark or name confusingly similar to or likely to dilute the Adler Marks, including by purchasing the Adler Marks or any confusingly similar marks as keywords; misappropriating Adler's name or likeness; and from any attempt to retain any part of the goodwill appropriated from Plaintiffs, including but not limited to by purchasing the Adler Marks as keywords;

(b)    Defendants, as well as their officers, agents, servants, employees, and attorneys, and other persons who are in active concert or participation with any of them, be required to deliver up and destroy all internet postings and advertisements distributing or displaying *Tough*, as well as any other materials bearing or using Plaintiffs' name or likeness, the Adler Marks, and/or any other mark or name that is confusingly similar to or likely to dilute the Adler Marks;

(c)      Defendants be ordered to file with this Court and to serve upon Plaintiffs, within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and under oath setting forth in detail the manner and form in which Defendants have complied with the injunction;

(d)      Plaintiffs recover all damages they have sustained as a result of Slocumb's activities, and that said damages be trebled;

(e)      Plaintiffs recover punitive damages in light of Defendants' willful and malicious violation of Plaintiffs' intellectual property rights;

(f)      An accounting be directed to determine Defendants' profits resulting from his activities and that such profits be paid over to Plaintiffs, increased as the Court finds to be just under the circumstances of this case;

(g)      Plaintiffs recover his reasonable attorneys' fees;

(h)      Plaintiffs recover his costs of this action and prejudgment/post-judgment interest; and

(i)      Plaintiffs recover such other relief as the Court may deem appropriate.

## <u>JURY DEMAND</u>

Plaintiffs demand a jury trial in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

Date: October 26, 2020                    *s/ Jered E. Matthysse*

Jered E. Matthysse
Attorney-in-Charge
Texas Bar No. 24072226
Federal Bar No. 1115779
PIRKEY BARBER PLLC
1801 East 6th Street, Suite 300
Austin, Texas 78702
Telephone: (512) 322-5200
Fax: (512) 322-5201
jmatthysse@pirkeybarber.com

Kurt Kuhn
Texas Bar No. 24002433
Federal Bar No. 22915
KUHN HOBBS PLLC
3307 Northland Drive, Suite 310
Austin, Texas 78731
Telephone: (512) 476-6005
Fax: (512) 476-6002
Kurt@KuhnHobbs.com

ATTORNEYS FOR ADLER